UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| DUODESK | CIVIL ACTION |
| VERSUS | NO. 14-1363 |
| GEE HOO INDUSTRIAL CORPORATION | SECTION A(3) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case was tried to the Court, sitting without a jury, on May 18-20, 2016. Having considered the testimony and evidence at trial, the arguments of counsel, and applicable law, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

**I.    Findings of Fact**

Plaintiff, DuoDesk, LLC ("DuoDesk"), is a Louisiana limited liability company that designs and sells what it calls "active motion sitting machines." The machines allow a user to pedal an elliptical machine under a desk, quietly exercising while working in an office setting. Christoph Leonhard is the president and founder of DuoDesk. Defendant, Gee Hoo Industrial Corporation ("Gee Hoo"), is a Taiwanese company that designs and manufactures various fitness and exercise equipment. Hank Hsu is the president and CEO of Gee Hoo.

In the fall of 2009, Leonhard contacted Hank Hsu about manufacturing a machine called the "LifeBalance Station." At the time, Leonhard acted as a member of Success Behavior, LLC ("Success Behavior"), the predecessor of DuoDesk. Prior to giving Gee Hoo any specific product-related information, Leonhard, through Success Behavior, supplied Gee Hoo with a Non-

1

Disclosure Agreement ("NDA"). In October of 2009, the NDA was signed and took effect between Gee Hoo and Success Behavior. The language of the NDA states that it inures to the benefit of the successors and assignees of Success Behavior and Gee Hoo.

Under the NDA, Gee Hoo agreed not to use Success Behavior's confidential and proprietary product and business information for any purpose other than to assist with product development, design, manufacturing, evaluation, and comprehensive guidance, without Success Behavior's prior written consent. The NDA specified that it protected confidential and proprietary product and business information related to a certain patent-pending product. (Exh. 165; Exh. 235). In 2009, when the parties signed the NDA, the patent-pending product they were referring to was the LifeBalance Station, an elliptical machine with a desk attached.

The NDA provided that Gee Hoo does not assume an obligation of confidentiality or a prohibition of use for information that the public previously knew. (Exh. 165; Exh. 235). The Court finds that the NDA does not protect information already in the public domain.

On November 11, 2009, Gee Hoo and Leonhard, through Success Behavior, signed an agreement through which Success Behavior paid Gee Hoo $5,000 to design and further develop the LifeBalance Station. Gee Hoo designed and manufactured the elliptical machine used for the LifeBalance Station. The desk portion of the LifeBalance Station was supplied by a third party supplier. Success Behavior did not place a second order for the LifeBalance Station with Gee Hoo or any other manufacturer.

In January 2012, DuoDesk contacted Gee Hoo to begin working on the activeLife Trainer. The activeLife Trainer is a small elliptical machine. It does not have a chair or desk attached to it. It is small enough to be placed under a user's office chair. In communicating about the activeLife

Trainer, the parties showed an intent to keep information relating to the product confidential in accordance with the NDA (Exh. 168).

On August 29, 2013, DuoDesk placed a Purchase Order with Gee Hoo for 200 units of the activeLife Trainer. The parties later increased this to 210 units. Under the Purchase Order, DuoDesk agreed to pay $155 per unit to Gee Hoo. The Purchase Order stated, "Seller hereby warrants that all machines furnished pursuant to this Purchase Order will be of good quality and free from defects in material or workmanship, including, without limitation, that the machines should operate quietly." (Exh. 33). In discussions about the Purchase Order, Leonhard said he looked forward to doing business with Gee Hoo in the future. (Exh. 33). The Court finds that Gee Hoo did not change its position to its detriment based on Leonhard's vague indication that the two would do business together in the future.

In working together to develop the activeLife Trainer, DuoDesk incurred $20,586.24 in development costs, which included travelling costs for Leonhard's trips to visit Gee Hoo and shipping costs for prototype machines (Exh. 549D, DuoDesk Demonstrative 4G). DuoDesk also did extensive marketing on the product. Leonhard testified that he created two websites, hired a local web developer, and made a promotional video. Leonhard's marketing costs totaled $14,376.75 (Exh. 549D, DuoDesk Demonstrative 4F). DuoDesk also paid for the Wahoo sensors that were installed in each machine, costing DuoDesk $8,092.68 (Exh. 549D, DuoDesk Demonstrative 4D).

On November 9, 2013, Leonhard traveled to Gee Hoo headquarters in Taiwan to inspect the machines before they were shipped to the United States. To Leonhard's surprise, Gee Hoo had not begun manufacturing the machines. Gee Hoo assembled a few machines while Leonhard was present, and there were defects in these units. Leonhard remained in Taiwan to discuss the defects.

Leonhard memorialized these discussions in writing. The parties call this the Product Quality Agreement ("PQA"). Leonhard and Hank Hsu signed this on November 13, 2013. The PQA provided that the "roller track on the chair attachment plate has to be between 2 mm and 7 mm wide," and "All other product features will be as I saw them in the factory, this includes even paint and finish, clean product, click free and squeak free operation, and packaging with (1) polybag and (2) Styrofoam as you showed me." (Exh. 73). The PQA further provided, "I will accept a manufacturing defect rate of 5% without recourse.  If this rate of manufacturing defects is exceeded, you agree to take back each defective unit. … 'Taking back' a unit means that you will refund the purchase price of any units with manufacturing defects beyond the acceptable 5% defect rate." (Exh. 73). The Court finds that the parties did not intend for this "taking back" provision to be DuoDesk's exclusive remedy in the event of a breach.

     Hank Hsu testified about Gee Hoo's quality control procedures. First, the manufacturing department checks the products for quality control. Then, the quality assurance department checks the products. Hank appointed his son, James Hsu, to manage the quality assurance department for the production of the activeLife Trainers. Hank Hsu testified that even though this was a small project, he appointed James because this project was important. This was James's first time managing quality assurance for a production.

     James Hsu testified regarding Gee Hoo's inspection records that relate to the activeLife Trainers. The records showed that 77 of the units at some point were marked deficient in an area called "Noise Inspection." The records further showed that at some point the roller track width on a significant number of units did not comply with the PQA provision requiring that the width be between 2 mm and 7 mm.

On December 2, 2013, as inspections were ongoing, Hank Hsu emailed Leonhard and said he had inspected 30 pieces and found no roller track width exceeding 7 millimeters and "no strange sounds." (Exh. 42). The Court finds that Hank Hsu wrote this with knowledge of the issues that were being discovered during inspections. This calls into question Hank Hsu's credibility.

On December 16, 2013, each inspection record was signed by a Gee Hoo representative. Each record showed that the machine had "retested OK." Although this seems to indicate that the problems were fixed before shipment, the Court concludes that the problems were not adequately addressed before Gee Hoo shipped the units. Based on the inspection records and related testimony, the Court finds that Gee Hoo knew about the defects before the machines were shipped.

In December of 2013, Gee Hoo shipped 205 activeLife Trainer units to DuoDesk at a warehouse in Seattle, Washington. DuoDesk incurred $4,486.44 of the shipping costs (Exh. 549D, DuoDesk Demonstrative 4E). The machines were delivered from the warehouse to DuoDesk's customers, without Leonhard seeing the machines beforehand.

Leonhard testified that he received complaints from customers. Photos and videos of the machines showed a variety of defects, including that the machines squeaked and that the roller track width exceeded 7 millimeters. Based on Leonhard's testimony, which the Court found credible, and based on examples shown at trial, the Court finds that the issues that were subject of the complaints were consistent with the issues noted in Gee Hoo's inspection records. This further persuades the Court that these defects existed when the products were shipped. The Court does not agree with Hank Hsu's self-serving testimony that the defects must have arisen during shipment.

Plaintiff's counsel qualified Leonhard as an expert on statistical analysis. Leonhard testified that, using the units he personally inspected as a representative sample of the whole 210 units, he concluded that the defective rate is likely approximately 79 percent. The Court found this

testimony credible and persuasive, and the Court concludes that approximately 79 percent of the 210 machines were defective in some way.

In February of 2014, Leonhard's wife, Chunlin Leonhard, and Hank Hsu exchanged emails about the defects. Chunlin said the defects made it impossible to continue marketing and selling the machines. (Exh. 49). She wrote that she and Leonhard did not believe the quality problems were a result of shipping or storage and that they "would like to try to meet with you in person to come up with a solution to these quality problems." (Exh. 49).

Hank Hsu replied that it was "hard to understand" a reason for the defects. (Exh. 49). He said he and his staff could do further testing on the machines and then, based on the results, decide how to proceed. (Exh. 49). He said another solution was for the Leonhards to ship the products back to Gee Hoo and allow Gee Hoo to sell them in Taiwan. (Exh. 49). He added, "Of course, we will return the payment to you absolutely." (Exh. 49). Regarding the latter option, Chunlin wrote, "We would like to accept that offer." (Exh. 49). Chunlin said they would return 172 units to Gee Hoo in exchange for $26,660. (Exh. 49). She said, "We will release these units for return shipment to you as soon as we receive your payment." (Exh. 49). The Court finds that Chunlin did not intend to put an end to any litigation with this agreement. Therefore, she did not compromise any claims.

In March of 2014, Gee Hoo sent $26,660 to DuoDesk. The Leonhards, however, did not return the units. Leonhard testified that he and Chunlin were at first grateful for the offer and prepared to send the units back. After agreeing to return the units, however, Leonhard learned about a program that could nurse the machines, using grease to stop the squeaking and other "band-aids," and then use the machines for research. Leonhard testified that doing this would allow DuoDesk to mitigate its damages. Leonhard testified that Hank Hsu was at first unhappy with DuoDesk keeping the machines but then changed his mind. Leonhard discussed emails exchanged

6

between the parties in June of 2014. In these emails, Chunlin thanked Hank for an "extensive phone call" and mentioned their "frank discussions," and she said she and Leonhard were "glad that we are able to move beyond our difficulties right now and come up with a plan for the future." (Exh. 261).

Leonhard testified that Hank Hsu offered to send Leonhard a sample of the new prototype but said he would only send it if Leonhard sent the units back. In August of 2014, in an email to Hank Hsu, Leonhard wrote, "As soon as you replace these defective units with units that actually work, we will be more than happy to return the defective units to you. For starters, please send me a prototype of your revised design that shows the mechanical problems are now solved." (Exh. 54).

In February of 2015, James Hsu, as a sales representative of Gee Hoo, attended a trade show in Germany. At the trade show, Gee Hoo displayed its 2014 Ankle Trainer, a small elliptical machine, similar to DuoDesk's activeLife Trainer. The Court finds that in making the 2014 Ankle Trainer, Gee Hoo used information that the public already knew. As early as 2011, the concept that DuoDesk calls an "active sitting motion machine" was on the market. (Exh.561; Exh. 562).

Leonhard testified that, due to Gee Hoo's breach of contract, DuoDesk lost an opportunity to capitalize on a spike in the interest of the activeLife Trainers in August of 2015. The spike in interest followed the publication of a study in which participants used activeLife Trainers. (Exh. 387). Leonhard pointed to an increase in views of a YouTube video featuring the activeLife Trainer as evidence of this spike in interest. (Exh. 59). The Court finds that Plaintiff has failed to prove by a preponderance of the evidence how an increase in the number of views of a YouTube video would have affected sales.

## II. Conclusions of Law

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because this is a dispute between a citizen of Louisiana and a citizen of a foreign state. DuoDesk is a citizen of Louisiana. Gee Hoo is a citizen of Taiwan. The amount in dispute, exclusive of fees and costs, exceeds $75,000. Venue is proper in this district and is not contested.

The Court concludes that the NDA is valid and enforceable under Illinois law. The Court concludes, based on the parties' intent, that the NDA governed the design and manufacture of both the LifeBalance Station and the activeLife Trainer. The Court concludes that Gee Hoo did not breach the NDA, because the NDA acknowledged that Gee Hoo could use information that the public already knew. DuoDesk is not entitled to injunctive relief under the NDA.

The laws of redhibition do not apply to this matter, as the Court concludes that the parties had a contract to build, not a contract of sale. *See First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, 2016 WL 1437165, *7 (E.D. La. 2016) ("([I]n a contract to build, [(1)] the 'purchaser' has some control over the specifications of the object; (2) the negotiations in a contract to build take place before the object is constructed; and (3) a building contract contemplates not only that the builder will furnish the materials, but that he will also furnish his skill and labor in order to build the desired object."); *Harkins v. Howard Lumber Co., Inc.*, 460 So.2d 772, 775 (La. App. 3d Cir. 1984).

The Court concludes that the Purchase Order, supplemented by the PQA, constituted an enforceable contract between the parties. The Court concludes that Gee Hoo breached this contract, thereby causing damage to DuoDesk.

The Court concludes that DuoDesk's contract claims are not extinguished due to Gee Hoo's performance of the contract. The fact that the parties' contract obligated Gee Hoo to provide a

refund to DuoDesk under certain circumstances does not lead to the conclusion that a refund is DuoDesk's sole remedy in the event of a total breach of contract.

The Court concludes that Gee Hoo's refund and Leonhard's acceptance of the refund did not constitute a compromise, as the parties' communications regarding the refund do not show a clear intent to settle specific differences. Louisiana Civil Code Article 3076 provides that "[a] compromise settles only those differences that the parties clearly intended to settle." The writing requirement demonstrates that Louisiana courts will not lightly assume an agreement to give up important legal rights. *See Bourgeois v. Franklin*, 389 So.2d 358, 361 (La. 1980).

Gee Hoo acted in bad faith and is liable to DuoDesk for the damages caused by the company's defective performance. La. C.C. art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which it has been deprived. La. C.C. art. 1995. An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. La. C.C. art. 1997. An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation. La. C.C. art. 1997, Revision Comment (b). "Bad faith" means more than mere bad judgment or negligence; it implies the conscious doing of a wrong for dishonest or morally questionable motives. *Bond v. Broadway*, 607 So.2d 865 (La. App. 2d Cir. 1992), *writ denied*, 612 So.2d 88 (La. 1993).

The Court concludes that DuoDesk incurred the following costs:

- Expenses relating to the development of the activeLife Trainers, totaling $20,586.24
- Marketing costs relating to the activeLife Trainers, totaling $14,376.75
- Cost of the Wahoo sensors installed into the defective machines, totaling $8,092.68
- Shipping costs for the defective machines, totaling $4,486.44

- Lost profits for the defective machines at a rate of $201 per unit, totaling $42,210.00 (This is based on an expected sales price of $495.00 per unit, minus the following costs: a unit cost of $155 per unit, Taiwan to Seattle freight charges of $21 per unit, Wahoo sensor cost of $38 per unit, customer shipping costs of $50 per unit, and storage costs of $30 per unit. (Exh. 588)).

- Storage costs up to the date that Gee Hoo tendered the refund, totaling $446.75 (To arrive at this figure, the Court used Exhibit 549D, DuoDesk Demonstrative Exhibit 4A. For the month of February, the Court awarded $229.00, pursuant to the chart. For the month of March, the Court awarded $8.71 per day through March 25, 2014. The Court used $8.71, as this is $270.07, the cost for March, divided by the 31 days in March.)

Because DuoDesk successfully sold 60 of the 210 machines (29 percent) at full price, however, the Court will reduce each of the above damage awards by 29 percent. The Court reasons that Gee Hoo's breach did not cause damages to DuoDesk with regard to 29 percent of the machines. Accordingly, the adjusted damages are as follows:

- Expenses relating to the development of the activeLife Trainers, totaling **$14,616.23**
- Marketing costs relating to the activeLife Trainers, totaling **$10,207.49**
- Cost of the Wahoo sensors installed into the defective machines, totaling **$5,745.80**
- Shipping costs for the defective machines, totaling **$3,185.37**
- Lost profits, totaling **$29,969.10**
- Storage costs up to the date that Gee Hoo tendered the refund, totaling **$317.19**

All of these expenses, foreseeable or not, resulted from Gee Hoo's breach and "would not have been incurred had there been no breach." *Bond*, 607 So.2d at 868.

DuoDesk is not entitled to damages for the time Leonhard spent developing these products. The Court concludes that the loss of Leonhard's time, due to taking part-time professor status, was not a "direct consequence" of Gee Hoo's defective performance. DuoDesk is not entitled to costs for developing a new machine, as this was not a "direct consequence" of Gee Hoo's defective performance. DuoDesk is not entitled to damages for future lost profits. Lost profits are not awarded where the profits are uncertain or conjectural. *Jolley Elevator Co. v. Schwegmann Bros. Giant Super Mkts.*, 230 So.2d 640, 643 (La. App. 4th Cir. 1970).

The total amount of damages is $64,041.18. The Court will not credit Gee Hoo for the $26,660 refund. The Court instead will require DuoDesk to return the machines in the warehouse, as discussed below.

Louisiana Civil Code Article 1997 does not expressly authorize an award for attorney fees and, under the jurisprudence, such an award cannot be made. *Benton v. Clay*, 123 So.3d 212, 225 (La. App. 2d Cir. 2013).

The parties' agreement regarding the refund constituted an enforceable contract, and the Court concludes that specific performance is required. Under Louisiana law, upon an obligor's failure to perform an obligation to deliver a thing, courts grant specific performance. La. C.C. art. 1986. An obligee enjoys the right to demand, insofar as is practicable, the specific performance of the obligation. *School of Pine Grove, Inc. v. St. Helena Parish School Bd.*, 9 So.3d 209, 222 (La. App. 1st Cir. 2009). If specific performance is impracticable, the court may allow damages to the obligee. La. C.C. art. 1986. The Court concludes that DuoDesk is required to ship the 126 units that remain in the Seattle warehouse to Gee Hoo. DuoDesk is not required to ship to Gee Hoo the 60 units that DuoDesk has sold to customers or the 19 units being used for research or for their spare parts (Exh. 588), as this is not practicable. Instead, DuoDesk owes Gee Hoo $155.00 per

11

machine for each of these 79 units, totaling $12,245.00. (The parties had agreed that DuoDesk would ship 172 machines in exchange for $26,660.00, which means the price per unit equaled $155.00.) Although the law allows the Court to award damages to the obligee due to the delay in performance of the contract, the Court declines to do so, as it concludes that Gee Hoo did not prove by a preponderance of the evidence that it suffered damages as a result of DuoDesk's failure to deliver the machines. After crediting Gee Hoo with $12,245.00, Gee Hoo's liability totals $51,796.18.

The Court concludes that DuoDesk is not liable for unjust enrichment, as there is another remedy at law, based on the parties' contract.

DuoDesk has not proved by a preponderance of the evidence that Gee Hoo misappropriated any trade secrets, as a trade secret is defined as information that is not known to or readily ascertainable through proper means by the public. *Marine Pile Drivers, L.L.C. v. Welco, Inc.*, 988 So.2d 878, 881 (La. App. 2d Cir. 2008); *Instant Tech., LLC v. DeFazio*, 40 F.Supp.3d 989, 1015 (N.D. Ill. 2014).

New Orleans, Louisiana, this 30th day of June, 2016

                                                                                          _____
                                                                                          JUDGE JAY C. ZAINEY
                                                                                          UNITED STATES DISTRICT JUDGE